UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **RICHARD ROBINS** | § § § | CIVIL ACTION |
| **Plaintiff** | § § § § | |
| vs. | § § § | |
| **U.S. DEPARTMENT OF EDUCATION** | § § | COMPLAINT FOR REVIEW |
| & | § § § | OF FINAL AGENCY ACTION |
| **MIGUEL CARDONA** in his official capacity as **U.S. SECRETARY OF EDUCATION** | § § § § | |
| **Defendants** | | |

## COMPLAINT

## INTRODUCTION

1. Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§701-706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, Plaintiff Richard Robins ("Plaintiff Robins") hereby brings this lawsuit. Its purpose is to challenge the legally noncompliant denial by the U.S. Department of Education and its *former* Secretary ("Defendants") of Plaintiff Robins' application for a discharge of a pair of federal student loans taken out by him while enrolled in an eventually *abruptly & violently closed* law school way down in Mexico City, Mexico during the mid-1990s. English language documentation of that school closure of the late 1990s and early 2000s exists, among other places, in this online New York Times article:

http://www.nytimes.com/library/world/americas/020200mexico-strike.html

1

# PARTIES

2. Defendant U.S. DEPARTMENT OF EDUCATION (hereinafter, the "Department of Education" or the "Education Department") is an agency of the United States within the meaning of the APA.  It is responsible for administering and adopting regulations that implement Title IV of the HEA.

3. Defendant MIGUEL CARDONA is the most recent Secretary (hereinafter, the "Secretary") of the United States Department of Education.  Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§ 1070-1099d, charges the Secretary with the responsibility of administering and overseeing the federal student loan programs, including the Direct Loan program.  Although the abovementioned loan discharge denial was apparently in no way Secretary Cardona's fault, as a formality he is nevertheless (*apologetically*) named as a defendant in his official capacity.

4. Collectively, both defendants are referred to herein as the "Defendants."

5. Plaintiff RICHARD ROBINS is a native born U.S. citizen, residing in Houston, Texas. During the mid-1990s and while living in the country of Mexico for six years, he took out a pair of federal student loans.  He did this while enrolled in an eventually abruptly & violently *closed* law school way down in Mexico City.  That school eventually partially reopened, but only after basically a year long hiatus and long after Plaintiff Robins had already permanently returned to the USA after sadly giving away his books to libraries in Mexico as well as most of his other possessions to friendly acquaintances.  He had also pragmatically discarded his lecture notes and other relevant papers before returning, due to international flight baggage weight & size limitations as well as the expectation that the university would never again reopen as a university instead of a residential community or business park, etc.  Plaintiff Robins subsequently embarked upon a career here in the USA that has basically nothing to do with a law degree from Mexico.  His pursuit of that pioneering endeavor overseas remains an ongoing symbol of squandered time & resources for him, even as the student loan debt's compound interest increasingly

detrimentally continues to grow at nearly 10% annually.

## JURISDICTION AND VENUE

6. This court has subject matter jurisdiction over this matter pursuant to the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701-706, as well as the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, in addition to 28 U.S.C. § 1331 (federal question) and also 20 U.S.C. §1082 (suits against the Secretary of Education).

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to the claim occurred in this district and Plaintiff Robins continues to reside in this district.

## DEFENDANTS' LEGALLY NONCOMPLIANT CONDUCT & THE PLAINTIFF'S ALLEGATIONS

## ADDITIONAL BACKGROUND

8. Congress established Title IV of the Higher Education Act (hereinafter "HEA") as a means of addressing, among other things, hesitation by potential students who feared enrolling in pioneering academic and / or professional degree programs out of fear that they could disintegrate before the corresponding degree could feasibly be obtained and used to try to repay the relevant student loans. The ongoing need for economic growth and societal progress require otherwise.

9. These goals really resonate with Plaintiff Robins. Upon Plaintiff Robins' diligently repaying all of his *other* student loans plus their corresponding compound interest of nearly 10% annually, he asked his student loan servicer (AES, an affiliate of PHEAA) if anything could be done about the exorbitant interest that had accumulated regarding the Mexico-related student loan from two decades beforehand. AES employees responsively reviewed Plaintiff Robins' documentation of his story which they said that they deemed to be unlike anything they had previously encountered. They ultimately agreed that a discharge of the Mexico-related loans was warranted. However, they said

3

they were prevented from effecting a discharge because the U.S. Department of Education had not (yet) entered the relevant university (the Universidad Nacional Autónoma de México) in its database of schools that had closed to the detriment of a U.S. student loan borrower's academic pursuits.

10. The U.S. Department of Education concedes that the relevant Mexican university's registration & certification with it was terminated in early 2002 and has not been reinstated ever since:

OPE ID #008513

This was the relevant division's contact data at the U.S. Department of Education at the time:

Department's Foreign Schools Team: fsa.foreign.schools.team@ed.gov .
Tel. 202-377-3168

The last time that Plaintiff Robins checked, no schools in Mexico's entire capital city of Mexico City (arguably the world's largest) remain certified with the U.S. Dept. of Education.

11. This is not surprising to Plaintiff Robins, who deemed the country to be so dangerous that he has not even set foot anywhere in Mexico, at all, in what is approaching 2 decades (and counting). In fact, since the relevant & extensive university closure of over two decades ago, Plaintiff Robins has only been inside of any part of Mexico for a *combined* total of less than a week. His passport data with the U.S. Department of State can confirm this. Even those few days were spent merely trying to solemnly tie up loose ends, paperwork-wise, in Mexico City while bidding a permanent farewell to some cherished & much-missed friends. Absolutely no time was ever spent by Plaintiff Robins at any vacation resort in Mexico after the university closure. Beforehand during his entire 6 years of residence in Mexico, only one single evening ever was. Ever. A major motive for moving to Mexico had simply been to get the law degree.

12. Even to this day, some of the relevant university remains shut down and dominated by protesters who physically and violently took over the place back in 1999.  Back during the university-wide closure of 1999 and 2000, molotov cocktails were getting thrown around and folks were reportedly getting killed.  Plaintiff Robins had already endured literally 28 physical attacks during his 6 years in Mexico.  Enough was enough. Mexico is now the world's #1 kidnapping nation.  Police were seldom of help, as John Rambo essentially stated in his most recent 2019 thriller *Rambo: Last Blood*.  Denzel Washington's movie *Man On Fire* also vividly depicts the security problems increasingly plaguing Mexico.  Bribery and extortion are increasingly rampant throughout Mexico, as anyone living in the USA who previously lived extensively in Mexico would likely admit.

13. Various other factors increasingly prevent Plaintiff Robins' simply returning and trying to enroll in the relevant university again.  The university cancels enrollment after extended absences.   Applying to enroll again takes at least a year, requiring the passage of numerous exams (in Spanish).  Furthermore his very hard-to-get work / student visa (a rare combination required under the circumstances of foreigners studying in Mexico) expired not long after his permanent return to the USA.  Meanwhile with the 700% peso devaluation that has happened gradually in Mexico since 1994, there is no feasible way to start the whole admissions and study process all over again.   Compounding matters, most lawyers earn remarkably small salaries in Mexico, even while dollar-denominated student loan debts are hardly miniscule.

14. Student loan deferments would be unavailable nowadays, too, because the university will not be reclaiming its certification & accreditation with the U.S. Department of Education that it lost over two decades ago (and counting).   Folks at that university seemingly tend not to like having folks from the U.S.A. there, anyway, as many students and faulty point out that much of the USA (including Texas) used to be Mexico.   They also attribute the narco-terrorist state of affairs nationwide to the USA's (admittedly)

rampant consumption of drugs and peddling of weapons abroad. World-famous smog and remarkably little earning potential for those who obtained a law degree there also exacerbate matters.

15. Anyhow the Ed. Department does not dispute that the borrower never returned to live anywhere in Mexico after the school closure, much less to try to resume studying in the world's leading kidnapping city of Mexico City. The State Department's entry & departure data regarding the borrower fully supports what's reported above. The school closure led to the borrower's failure to obtain the law degree, and pursuant to the HEA relief is warranted.

16. The Education Department nevertheless told Plaintiff Robins in a series of e-mails during late October and November of 2016 that because the relevant school's closure was not permanent (which actually is not accurate, depending upon which part of the university is considered), the school cannot be placed in the Department's school closure database so the relevant student loan cannot be ordered discharged.

## FIRST CAUSE OF ACTION

17. The Defendants' denials of Plaintiff Robins' closed school discharge application was arbitrary, capricious, an abuse of discretion, contrary to law, and otherwise not in accordance with the HEA, 20 U.S.C. § 1087(c), in violation of the APA, 5 U.S.C. § 706(2)(A). In denying the Plaintiff's discharge applications, the Department improperly disregarded the statutory closed school discharge mandate of the HEA, 20 U.S.C. § 1087(c). Instead, the Department created requirements which conflict with the statute's broad mandate by narrowing closed school discharge eligibility for students regardless of whether the relevant closure caused them not to obtain the academic degree. The Major Questions doctrine, to be documented in upcoming filings from Plaintiff Robins, does not let the Education Department nondemocratically add restrictions to the Higher Education Act (HEA) statute, etc. that are significantly & meaningfully not already there. Even

6

existing statutory text does not permit this outcome.

18. If the Department of Education wants to continue claiming that the HEA does not say that a discharge should be available for a supposedly "nonpermanent" school closure that nevertheless caused the student to give up on pursuing the (overseas) degree and instead to (permanently) return to the USA, there is authority to show that they are neglecting what the law and rules actually say. Indeed, the applicable statutory, code and regulatory provisions do not require that a school's closure be permanent in order for a student loan debt to warrant a discharge. In fact, the notion of *permanence* is completely unmentioned in the three directly applicable provisions included (verbatim) below, and rightly so. The focus is instead upon merely whether the school closure led to the nonattainment of the academic degree:

**Higher Education Act of 1965, Sec. 437C**:

437 (c) DISCHARGE.— (1) IN GENERAL.—If a borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which such student is enrolled due to the closure of the institution or if such student's eligibility to borrow under this part was falsely certified by the eligible institution, or if the institution failed to make a refund of loan proceeds which the institution owed to such student's lender, then the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part H.

Meanwhile:

20 USC §1087 (c) (1):
If a borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which such student is enrolled due to the closure of the institution or if such student's eligibility to borrow under this part was falsely certified by the eligible institution or was falsely certified as a result of a crime of identity theft, or if the institution failed to make a refund of loan proceeds which the institution owed to such student's lender, then the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation pursuant to the financial responsibility authority under subpart 3 of part G.

7

Furthermore:

34 CFR §685.214

(a) General. (1) The Secretary discharges the borrower's (and any endorser's) obligation to repay a Direct Loan in accordance with the provisions of this section if the borrower (or the student on whose behalf a parent borrowed) did not complete the program of study for which the loan was made because the school at which the borrower (or student) was enrolled closed, as described in paragraph (c) of this section.
…
(c) Borrower qualification for discharge. (1) In order to qualify for discharge of a loan under this section, a borrower must submit to the Secretary a written request and sworn statement, and the factual assertions in the statement must be true. The statement need not be notarized but must be made by the borrower under penalty of perjury….
. . . . .


19. There is no reference to >permanence< where school closure is mentioned in the abovementioned statutory, codified and regulatory provisions.  The notion of >permanence< nevertheless appears elsewhere in those provisions' overall statutory, codified and regulatory authorities in the context of closures, though, perhaps most revealingly at the following:

**34 CFR §600.40    Loss of eligibility**.
(a)(1) Except as provided in paragraphs (a) (2) and (3) of this section, an institution, or a location or educational program of an institution, loses its eligibility on the date that—
(i) The institution, location, or educational program fails to meet any of the eligibility requirements of this part.
(ii) The institution or location permanently closes;
(iii) The institution or location ceases to provide educational programs for a reason other than a normal vacation period or a natural disaster that directly affects the institution, particular location, or the students of the institution or location; or
(iv) For purposes of the title IV, HEA programs—
(A) The institution's period of participation as specified under 34 CFR 668.13 expires; or
(B) The institution's provisional certification is revoked under 34 CFR 668.13.
(2) If an institution loses its eligibility because it violated the requirements of §600.5(a)(8), as evidenced by the determination under provisions contained in §600.5(d), it loses its eligibility on the last day of the fiscal year used in §600.5(d), except that if an institution's latest fiscal year was described in §600.7(h)(1), it loses its eligibility as of June 30, 1994.
(3) If an institution loses its eligibility under the provisions of §600.7(a)(1), it loses its eligibility on the last day of the award year being evaluated under that provision.

(b) If the Secretary undertakes to terminate the eligibility of an institution because it violated the provisions of §600.5(a)(8) or §600.7(a), and the institution requests a hearing, the presiding official must terminate the institution's eligibility if it violated those provisions, notwithstanding its status at the time of the hearing.
(c)(1) If the Secretary designates an institution or any of its educational programs or locations as eligible on the basis of inaccurate information or documentation, the Secretary's designation is void from the date the Secretary made the designation, and the institution or program or location, as applicable, never qualified as eligible.
(2) If an institution closes its main campus or stops providing any educational programs on its main campus, it loses its eligibility as an institution, and that loss of eligibility includes all its locations and all its programs. Its loss of eligibility is effective on the date it closes that campus or stops providing any educational program at that campus.
(d) Except as otherwise provided in this part, if an institution ceases to satisfy any of the requirements for eligibility under this part—
(1) It must notify the Secretary within 30 days of the date that it ceases to satisfy that requirement; and
(2) It becomes ineligible to continue to participate in any HEA program as of the date it ceases to satisfy any of the requirements.

20. Congress insightfully wants for folks to better themselves through education, and not to counterproductively hesitate in doing so out of fear that (for example) a school focused on a pioneering, cutting-edge field might unforeseeably close down while studies are nevertheless underway. It would help if the Department of Education would finally start following laws such as the Higher Education Act more compliantly, without inventing (imaginary) requirements that are not in the statute.   Courts have repeatedly overturned the Ed. Department for imposing excessively demanding requirements on borrowers seeking relief, requirements which Congress did not see fit to enact into law.  The U.S. Department of Education receives a very lofty annual budget from Congress each year in exchange for, among other things, insuring the viability of student borrowers' academic pursuits.  It is not fair for the Department to nevertheless get to betray the students and taxpayers who finance its (presently inadequate) performance presumably for students' well-being.

21.   The Education Department's spokespeople might try to counter judges' and other reformers' relevant critiques by attempting to claim that federal agencies possess unique expertise regarding how to interpret what congressionally enacted statutes ought to say,

even when such statutes do not. Nevertheless, this would be an unconstitutional usurpation of legislative and judicial governmental powers by an unelected bureaucratic class whose lucrative tenure endures well beyond the presidencies in existence when they became federally employed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff Robins respectfully requests that this Court please enter a judgment against the Defendants as follows:

1) Declaring that the Defendants' denial of the Plaintiff's closed school discharge application was arbitrary, capricious, an abuse of discretion, contrary to law, and otherwise not in accordance with the HEA, 20 U.S.C. § 1087(c), etc., in violation of 5 U.S.C. § 706(2);

2) Reversing the Department's final decisions denying the Plaintiff's closed school discharge application pursuant to 5 U.S.C. § 706(2);

3) Compelling the Defendants, pursuant to 5 U.S.C. § 706(1), to

4) Discharge the liability on the Plaintiff's relevant student loans under their jurisdiction; and grant the Plaintiff all relief authorized by 20 U.S.C. § 1087(c)(1); and

5) Declare that under the HEA, 20 U.S.C. § 1087(c), the Department is obligated to discharge the Direct Loan(s) of the Plaintiff borrower and provide the relief authorized by 20 U.S.C. § 1087 (c) because that borrower submitted an application, under oath, attesting that the school's closure (even if not entirely permanent) resulted in the nonobtention of the academic degree pursued; and

6) Order, if this legal dispute endures for an additionally extended and burdensome period of time, the Defendants to pay the Plaintiff's costs of this action, pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412(d)(1)(A), as determined by the Court; and otherwise

7) Grant the Plaintiff any other relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff Robins herein respectfully demands a trial by jury of all triable issues in the present matter.

DATED: October 21st, 2022  **Respectfully submitted**,

Richard Robins, Pro Se Plaintiff
2450 Louisiana St. #400-155
Houston, TX 77006
(832) 350-1030 Tel.
(713) 574-6279 Fax.
[E-mail is strongly preferred over faxing, please.]
Rich@ConsumerRights.US


By: _____
Richard Robins
Pro Se Plaintiff

## CERTIFICATE OF SERVICE

    I, Richard Robins, do hereby, certify that I will timely send a true and correct copy of the above complaint via certified US MAIL (or satisfactory alternative means) to the Defendants the U.S. Department of Education & its Secretary in accordance with the Federal Rules of Civil Procedure:

**U.S. Department of Education & Secretary Miguel Cardona**
c/o Legal Department
400 Maryland Avenue, SW
Washington, D.C. 20202


By: _____
        Richard Robins
        Pro Se Plaintiff